Victoria **GREENBAUM**, Plaintiff,

v.

**SVENSKA HANDELSBANKEN,
NY, Defendant.**

No. 95 Civ. 3850(SS).

United States District Court,
S.D. New York.

Sept. 23, 1997.

Robert E. Sapir, Cooper, Sapir & Cohen Melville, New York, Donald L. Sapir, Sapir & Frumkin, LLP., White Plains, New York, Robert T. McGovern, Louis S. Santangelo, Steven R. Shapiro, of Counsel, for plaintiff.

Peter N. Hillman, Debra M. Patalkis, Chadbourne & Parke, LLP., New York City, Jonathan M. Sobel, Mitchell P. Hurley, Of Counsel, for defendant.

## *OPINION AND ORDER*

SOTOMAYOR, District Judge.

The above-referenced action was tried before a jury from April 28, 1997 to May 12, 1997. On May 16, 1997, the jury rendered a verdict in favor of plaintiff on her claims of gender discrimination and retaliation and against plaintiff on her claims of sexual harassment and age discrimination. The jury awarded plaintiff $320,000.00 in back pay and $1,250,000.00 in punitive damages. The parties then filed post-trial motions, including defendant's motion regarding the correct standard of proof for punitive damages under New York law and the appropri-

ate cap on punitive damages under Title VII, and plaintiff's motions for prejudgment interest, front pay or reinstatement. Plaintiff has also filed a motion for reasonable attorneys' fees, which motion will be addressed at a later date.

## BACKGROUND

Plaintiff Victoria Greenbaum, age 47, was formerly an assistant vice president in the trading room of defendant Svenska Handelsbanken, New York ("SNY"). SNY is the New York branch office of a much larger banking corporation known as Svenska Handelsbanken AB ("SHB"), headquartered in Stockholm, Sweden. After repeatedly being denied promotion to vice president at SNY, plaintiff brought an action in the Southern District claiming that the defendant violated her rights under Title VII and the equivalent provisions of the New York Human Rights Law and New York City Administrative Code. Plaintiff alleged that she was denied promotions and other benefits afforded other employees because of her gender and her age. She also claimed that she was subjected to a hostile work environment and that she was retaliated against because of her filing of an administrative complaint with the New York State Division of Human Rights.

The jury was charged on all of plaintiff's claims. Because the state of the law with respect to the appropriate burden of proof for establishing punitive damages under state law was unclear, the Court charged the jury with two evidentiary standards, charging punitive damages under a preponderance standard for plaintiff's Title VII claim and under a clear and convincing standard for plaintiff's claim under the New York City Administrative Code. As noted above, the jury found in favor of plaintiff on her gender discrimination and retaliation claims, but against her on all other claims. They awarded compensatory damages and punitive damages under the federal preponderance standard, but they declined to award punitive damages under the clear and convincing standard charged under state law. The instant post-trial motions followed.

## DISCUSSION

### I. Punitive Damages

#### A. The Appropriate Standard of Proof for Punitive Damages under New York Law

One court has recently recognized that "New York law on burden of proof in deciding punitive damages is unclear." *Geressy v. Digital Equipment Corp.,* 950 F.Supp. 519, 522 (E.D.N.Y.1997); *see also* Richard L. Blatt et al., *Punitive Damages: A State–by–State Guide to Law and Practice* § 8.42 (1993 & 1996 Supp.) ("It appears as though the New York courts themselves have not specifically addressed the burden of proof in the context of punitive damages."). The federal and state court cases on the question are mired in a morass of ambiguity. Often, both New York and federal courts applying New York law have invoked the wanton and malicious substantive standard of conduct relating to punitive damages, *see, e.g., Geressy,* 950 F.Supp. at 522 (discussing the high substantive standard for punitive damages under New York law), without discussing the evidentiary standard of proof applicable thereto. *See, e.g., United States v. Merritt Meridian Construction Corp.,* 95 F.3d 153, 160 (2d Cir.1996) (discussing type of conduct warranting punitive damages in breach of contract case, but neglecting to mention evidentiary standard applicable thereto); *Cleveland v. Beltman North American Co., Inc.,* 30 F.3d 373, 376 (2d Cir.1994) (discussing punitive damages at length and providing substantive standard without any discussion of applicable burden of proof), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 901, 130 L.Ed.2d 785 (1995); *Riordan v. Nationwide Mutual Fire Ins. Co.,* 977 F.2d 47, 56 (2d Cir.1992) (certifying to New York Court of Appeals question of whether provision of state insurance law preempts common law right to punitive damages and, if not, what substantive standard was applicable to recover punitive damages; no discussion of evidentiary standard), *certified question withdrawn due to mootness,* 984 F.2d 69 (2d Cir.1993); *MaGee v. Paul Revere Life Ins. Co.,* 954 F.Supp. 582, 588 (E.D.N.Y.1997) (extensive discussion of standard of conduct warranting punitive damages but no mention of burden of proof on the

question); *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 315–16, 639 N.Y.S.2d 283, 287, 662 N.E.2d 763, 767 (1995) (discussing punitive damages substantive standard of "gross" and "morally reprehensible behavior" without mentioning evidentiary standard); *Rocanova v. Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339, 342–43, 634 N.E.2d 940, 943–44 (1994) (characterizing substantive standard for punitive damages in breach of contract case as "strict" but not discussing evidentiary standard); *Home Ins. Co. v. American Home Prods. Corp.*, 75 N.Y.2d 196, 201, 551 N.Y.S.2d 481, 484, 550 N.E.2d 930, 933 (1990) (discussing substantive standard for punitive damages in product liability case, but not providing burden of proof required for punitive damages); *Mulder v. Donaldson, Lufkin & Jenrette*, 208 A.D.2d 301, 308–09, 623 N.Y.S.2d 560, 564–65 (1st Dept.1995) (discussing substantive standard of conduct warranting punitive damage without mention of evidentiary standard).

Adding to the confusion, the Second Circuit has tacitly endorsed both instructions that charge juries with preponderance of the evidence, *see, e.g., Denny v. Ford Motor Co.*, 42 F.3d 106, 110 (2d Cir.1994) (quoting, without discussion, district court's verdict form that applied preponderance standard); *Vasbinder v. Ambach*, 926 F.2d 1333 (2d Cir. 1991) (quoting, without discussion, jury instruction which provided that in order to recover punitive damages "plaintiff has the burden of proving by a fair preponderance of the credible evidence that a defendant acted maliciously or wantonly with regard to his rights."), and instructions that charge juries with the clear and convincing standard. *See, e.g., Racich v. Celotex Corp.*, 887 F.2d 393, 397 (2d Cir.1989) (quoting, without discussion, district court's jury instruction that punitive damages be "clearly established"); *Brink's, Inc. v. City of New York*, 717 F.2d 700, 706 n. 4 (2d Cir.1983) (quoting, in a footnote and without discussion, jury instruction that conduct "tantamount to 'willful, wanton and reckless' conduct" had to be found by "clear and convincing evidence").

Where the cases do specify a particular burden of proof with respect to punitive damages—as opposed to merely quoting trial court jury instructions that charge either standard—the authorities are also in conflict. Some cases call for application of the preponderance standard. *See Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 282–283 (2d Cir.) (rejecting a due process claim that clear and convincing evidence standard must be applied to punitive damages and noting that "[a]ppellant acknowledges that the burden of proof under New York law for punitive damages in product liability cases is 'preponderance of the evidence.' "), *cert. dismissed*, 497 U.S. 1057, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990); *United States v. Hooker Chemicals & Plastics Corp.*, 850 F.Supp. 993, 1003 (W.D.N.Y.1994) ("The applicable standard of proof for punitive damages is preponderance of the evidence, which the Supreme Court held suffices even in civil suits involving 'proof of acts that expose a party to criminal prosecution.' "); *Lawrence v. Cade & Saunders*, 149 F.R.D. 14, 17 (N.D.N.Y. 1993) (providing that "the plaintiff has the burden of proving by a fair preponderance of the credible evidence that defendants acted maliciously or wantonly."); *Corrigan v. Bobbs–Merrill Co.*, 228 N.Y. 58, 66–67, 126 N.E. 260, 264 (1920) (libel case providing that "[i]n order to recover punitive damages, plaintiff was bound to satisfy the jury by a fair preponderance of evidence" that defendant had ill will toward him and that defendant did not publish book in good faith and honest belief that it was fiction); *In re Seventh Judicial District Asbestos Litig.*, 190 A.D.2d 1068, 1069, 593 N.Y.S.2d 685, 687 (4th Dept.1993) (providing that "[t]he trial court properly instructed the jury that the evidentiary standard for proving entitlement to punitive damages is preponderance of the evidence, not clear and convincing evidence") (citing cases and contrary authority in *Camillo* ); *Frechette v. Special Magazines*, 285 A.D. 174, 176, 136 N.Y.S.2d 448, 451 (3rd Dept.1954) (libel case noting trial court's jury instructions which provided that "plaintiff must establish" punitive damages "by a fair preponderance of the evidence.").

Other courts have applied a clear and convincing evidence standard for punitive damages under New York law. *See Roginsky v. Richardson–Merrell, Inc.*, 378 F.2d 832, 850–51 (2d Cir.1967) ("New York demands, as is might have to before punishing a defendant

with fines similar to those imposed on a criminal charge, that the quality of conduct necessary to justify punitive damages must be 'clearly established.' ") (citing *Cleghorn v. New York Cent. & H.R.R.R.*, 56 N.Y. 44, 48 (1874)); *West v. The Goodyear Tire & Rubber Co.*, 973 F.Supp. 385, 389–90 (S.D.N.Y. 1997) (citing *Camillo v. Geer*, 185 A.D.2d 192, 587 N.Y.S.2d 306, 309 (1st Dept.1992) for the proposition that under New York law "an award for punitive damages 'must be supported by clear, unequivocal, and convincing evidence.' "); *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 927 F.Supp. 650, 664 (S.D.N.Y.1996) (noting in fraud case that plaintiff conceded that "it had to prove its entitlement to punitive damages by clear and convincing evidence."), *aff'd* 119 F.3d 91 (2d Cir.1997); *Sladick v. Hudson General Corp.*, 226 A.D.2d 263, 264, 641 N.Y.S.2d 270, 271 (1st Dept.1996) (holding that "[p]laintiff failed to demonstrate by clear, unequivocal and convincing evidence that defendants' conduct was so wanton or reckless as to justify an award of punitive damages") (citing *Camillo v. Geer*, 185 A.D.2d 192, 193–94, 587 N.Y.S.2d 306 and *Home Ins. Co. v. American Home Prods. Corp.*, 75 N.Y.2d 196, 201, 202–04, 551 N.Y.S.2d 481, 550 N.E.2d 930); *Camillo v. Geer*, 185 A.D.2d 192, 587 N.Y.S.2d 306 (1st Dept.1992) (providing that "[a]n award for punitive damages must be supported by clear, unequivocal, and convincing evidence.") (citing *Cleghorn v. New York Cent. & Hudson River R.R.*, 56 N.Y. 44, 48 (1874)).

This lack of a clear and consistent articulation of the appropriate evidentiary standard with respect to punitive damages impels this Court to discuss and determine the appropriate burden of proof on this question as a matter of first impression in this district. *Cf. West v. The Goodyear Tire & Rubber Co.*, 973 F.Supp. 385, 387, 389–90 (S.D.N.Y.1997) (citing, without discussion, *Cleghorn v. New York Cent. & H.R.R.R.*, 56 N.Y. 44, 48 (1874) and *Camillo v. Geer*, 185 A.D.2d 192, 587 N.Y.S.2d 306, 309 (1st Dept.1992) for the proposition that clear and convincing evidence is appropriate standard of proof for punitive damages); *Geressy*, 950 F.Supp. at 522 (Eastern district case suggesting that preponderance of the evidence is appropriate standard, but noting that issue was moot because jury found that punitive damages were not warranted under either standard).

### 1. *New York Court of Appeals Precedent*

■ On questions of state law, federal courts are obliged to look first to the opinions of the state's highest court in attempting to predict how that court would rule on a particular question. *See, e .g., In re Eastern & Southern Dists. Asbestos Litig.*, 772 F.Supp. 1380, 1389 (E. & S.D.N.Y.1991) (providing that a court "must carefully review available resources to predict how the New York Court of Appeals would resolve the questions at bar."), *aff'd in part, rev'd in part*, 971 F.2d 831 (2d Cir.1992). Contending that the clear and convincing standard is the appropriate standard for punitive damages under New York law, the defendant rests its conclusion upon a New York Court of Appeals Case from 1874, *Cleghorn v. New York Cent. & H.R.R.R.*, 56 N.Y. 44, 48 (1874).

*Cleghorn* involved a claim brought by a person injured by a railman's negligence. On the question of whether the jury was appropriately charged on the question of exemplary damages, the Court concluded that the error was clearly erroneous to the extent that it provided no guidelines by which the jury could make such a determination. In explaining when a master could be liable in punitive damages for the negligence of his servants, the Court stated that:

> For injuries by the negligence of a servant while engaged in the business of the master, within the scope of his employment, the latter is liable for compensatory damages; but for such negligence, however gross or culpable, he is not liable to be punished in punitive damages unless he is also charged with gross misconduct. Such misconduct may be established by showing that the act of the servant was authorized or ratified or that the master employed or retained the servant, knowing that he was incompetent, or, from bad habits, unfit for the position he occupied. Something more than ordinary negligence is requisite; it must be reckless and of a criminal nature, and *clearly established* .... I am not award of any principle which permits a jury to award exemplary damages in a cases which does not come up to this standard, or to graduate the amount of such

damages by their views of the propriety of the conduct of the defendant, unless such conduct is of the character before specified.

*Id.* at 47–48 (emphasis added).

Defendant contends that this excerpt unequivocally demands that the clear and convincing standard be applied to all punitive damages determinations. Although the excerpt does provide some support for that proposition, I am not as convinced as the defendant, particularly because the Court does not expressly define the evidentiary standard as "clear and convincing," *but see Addington v. Texas,* 441 U.S. 418, 424, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (providing that the "intermediate standard" of clear and convincing evidence "employs some combination of the words, 'clear,' 'cogent,' 'unequivocal.'"), and because it focuses all of its analysis on the substantive standard of conduct warranting punitive damages rather than any evidentiary standard applicable thereto. In this context, outside of any overt reference to evidentiary standards or burdens of proof, I cannot so easily as defendant find that the Court of Appeals intended in *Cleghorn* to create an evidentiary, as opposed to substantive, standard in the imposition of punitive damages.

However, had the New York Court of Appeals thereafter remained silent on the issue, the instant question before the Court might have been clearer. But a significantly more recent Court of Appeals decision, *Corrigan v. Bobbs–Merrill Co.,* 228 N.Y. 58, 126 N.E. 260 (1920), recommends the precise opposite result: that the preponderance standard applies to punitive damages determinations.

In *Corrigan,* a libel case decided long before the United States Supreme Court's watershed opinion in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court of Appeals laid out the substantive and evidentiary standard necessary for recovery of punitive damages:

> In order to recover punitive damages, plaintiff was bound to satisfy the jury *by a preponderance of the evidence* that defendant (1) was animated, in such publication, by conscious ill will toward him, or (2) did not publish the Cornigan chapter of the book in good faith and in honest belief that it was fiction, but was indifferent as to whether the violent and indecent abuse ·heaped upon the supposedly fictitious magistrate would injure some real party actually referred to by the author.

*Id.* at 66–67, 126 N.E. 260. While the Court did not elucidate the reason for the evidentiary standard to which it referred, it nonetheless patently asserted it, without any mention of the seemingly contrary law propounded in *Cleghorn.*

In the end, the New York Court of Appeals cases raise more questions than they answer. Neither case revolves around, or even pays more than a phrase's attention to, the question of the evidentiary standard applicable to a punitive damages determination. The first, *Cleghorn,* only vaguely suggests a clear and convincing standard. *Corrigan,* on the other hand, directly applies the preponderance standard, but it, too, is a rather dated opinion that has since been effectively overruled by the Supreme Court's landmark decision in *New York Times v. Sullivan,* which requires that the libel case be proven by clear and convincing evidence. Despite the ambiguity in these opinions, however, I conclude that the plaintiff's argument for the preponderance standard prevails, if for no other reason than its seminal case, *Corrigan,* was at least more recently decided.

### 2. *Second Circuit Case Law*

Having concluded that the more recent law in the New York Court of Appeals would suggest that the preponderance standard applies, I now turn to an examination of the three Second Circuit cases cited by defendant in which jury charges with clear and convincing language were upheld by that Court. (*See* Def.Pun.Dam.Mem. at 4 (citing *Roginsky, Brink's,* and *Racich* ) ).[1] In *Ra-*

---

[1] Defendant also cites lower court authorities for the proposition that the clear and convincing standard applies to punitive damages determinations. *See Sladick v. Hudson Gen. Corp.,* 226 A.D.2d 263, 263, 641 N.Y.S.2d 270, 271 (1st Dept.1996) (providing that "[p]laintiff failed to demonstrate by clear, unequivocal and convincing evidence that defendants' conduct was so wanton or reckless as to justify an award of punitive damages"); *Camillo v. Geer,* 185 A.D.2d 192, 587 N.Y.S.2d 306 (1st Dept.1992) ("An award for punitive damages must be supported

*cich v. Celotex Corp.*, 887 F.2d 393, 397 (2d Cir.1989), the most recent of the Second Circuit cases cited by the defendant, the Court was not clear about the appropriate evidentiary standard applicable to a punitive damages award. The Second Circuit in *Racich* refused to consider appellant's argument that the punitive damage award violated federal standards of due process because the argument had not been properly preserved. *See Racich*, 887 F.2d at 398. However, the Court did consider appellant's argument that "the standard governing the award of punitive damages is constitutionally void for vagueness." *Id.* For context, I quote the Court's discussion in full:

> The indefinite phrases that will support such an award, appellant contends, do not give fair warning regarding prohibited conduct, and fail properly to confine the discretion of judges and juries in the absence of some sort of statutory limit. In this case, the jury was charged that it might, but was not required to, allow plaintiff punitive damages if it found that it was clearly established that the acts of the defendant were "wanton or reckless." These concepts were defined in apparently traditional terms under New York law, or at least there is no claim to the contrary. Rather, the claim is, as counsel for appellant made clear at oral argument, that the jury was given constitutionally deficient guidance.

*Id.* at 398.

The defendant contends that this excerpt from the *Racich* opinion supports its argument that the clear and convincing standard is the appropriate standard in the punitive damages context. The defendant emphasizes the Court's determination that the "concepts were defined in apparently traditional terms

under New York law...." *Id.* Obviously, however, the "concepts" that the Second Circuit deemed "traditional" under New York law were the concepts of "wanton or reckless." Those words are the only words in quotation marks in the immediately preceding sentence, and those are the words that provide some guidance to jurors, which would defeat the vagueness argument being made by the appellants therein. An evidentiary standard would not remedy a vagueness problem. Clearly, then, the Second Circuit was not claiming that the clear and convincing standard—even if that is what the Court meant when it casually invoked the words "clearly established" out of quotation or context from the district court's charge—was "traditional" under New York law. *See Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 282–83 (2d Cir.1990) (underscoring that *Racich* court endorsed substantive standard, not burden of proof, by contrasting discussion of burden of proof relating to punitive damages with "traditional formulations of the standards governing punitive damages awards in *Racich*.") (emphasis added). Hence, *Racich* offers little support for defendant's argument.

The next most recent Second Circuit case cited by the defendant is *Brink's, Inc. v. City of New York*, 717 F.2d 700 (2d Cir.1983). Unfortunately, in that case, the Second Circuit was no more clear on the instant question before this Court. In footnote four of the opinion, the Second Circuit wrote:

> The jury was instructed that it had to find by "clear and convincing evidence" that [the defendant's] conduct amounted to gross negligence tantamount to "willful, wanton and reckless" conduct. On the basis of the evidence summarized above,

by 'clear, unequivocal, and convincing evidence.'"); *see also Schlaifer Nance & Co. v. Estate of Andy Warhol*, 927 F.Supp. 650, 664 (S.D.N.Y. 1996) (providing that plaintiff "had to prove its entitlement to punitive damages by clear and convincing evidence") (not cited by defendant).

However, because there are just as many lower court cases propounding the opposite rule of law, *see, e.g., In re Seventh Judicial District Asbestos Litig.*, 190 A.D.2d 1068, 1069, 593 N.Y.S.2d 685, 686–87 (4th Dept.1993) ("The trial court properly instructed the jury that the evidentiary standard for proving entitlement to punitive damages is preponderance of the evidence.") (citing

cases); *Lawrence v. Cade & Saunders, P.C.*, 149 F.R.D. 14, 17 (N.D.N.Y.1993) ("At trial, the plaintiff has the burden of proving by a fair preponderance of the credible evidence that defendants acted maliciously or wantonly."); *United States v. Hooker Chemicals & Plastics Corp.*, 850 F.Supp. 993, 1003 (W.D.N.Y.1994) ("The applicable standard of proof for punitive damages is preponderance of the evidence...."), and because none of the opinions cited by the defendant provide any reasoned analysis of the law to the contrary, I do not address the lower court cases.

we cannot say either that there was a complete absence of probative evidence to support the verdict of that no reasonable and fair-minded jury could arrive at this verdict.

*Id.* at 706 n. 4. Despite defendant's somewhat misleading suggestion that "[t]he Second Circuit affirmed this charge without reservation," (Def.Pun.Dam.Mem. at 9), nowhere in the *Brink's* opinion is there any discussion, beyond the above-quoted passage from footnote four, of the appropriate standard of proof relating to punitive damages. I cannot conclude that the Second Circuit's mere quotation of a jury charge in a footnote amounts to an affirmance "without reservation." At best, it is a tacit endorsement of the jury charge, which is confusing in light of contrary Second Circuit precedent that suggests that the preponderance standard is the appropriate standard for punitive damages under New York law. *See,* supra and infra discussion of *Simpson.* Moreover, the Second Circuit in *Brink's* did not have occasion to address the question because the parties did not bring the issue before it and because if they had, the issue would have been moot: the jury in *Brink's* found punitive damages appropriate even under the higher standard of proof.

The final Second Circuit case cited by defendant, *Roginsky v. Richardson–Merrell, Inc.,* 378 F.2d 832 (2d Cir.1967), best supports its argument that the clear and convincing standard is the appropriate evidentiary standard for punitive damages under New York law. However it, too, is distinguishable and ultimately inconsistent with more recent precedent to the extent that it invokes a nineteenth century Court of Appeals decision to suggest that New York law imposes the clear and convincing standard on all punitive damages determinations.

Authored by the prestigious Judge Friendly, *Roginsky* involved fraud [2] and product liability claims brought by a plaintiff who contended that a drug developed by the defendant that was intended to lower blood cholesterol levels had in fact caused his cata-

racts. In parsing the language and analysis of the opinion, this factual context is revealed as extremely important to the issue before the Court. This is so because in *Roginsky,* the Court was faced with a situation in which the imposition of punitive damages against the defendant was highly unpalatable to it. Judge Friendly wrote that "if we were sitting as the highest court of New York we would wish to consider very seriously whether awarding punitive damages with respect to the negligent—even highly negligent—manufacture and sale of a drug governed by federal food and drug requirements . . . would not do more harm than good." *Id.* at 840–41.

The Court was not in such a position, however, so it wrote:

However, the, New York cases afford no basis for our predicting that the Court of Appeals would adopt a rule disallowing punitive damages in a case such as this, and the *Erie* doctrine wisely prevents our engaging in such extensive law-making on local tort liability, a subject which the people of New York have entrusted to their legislature and, within appropriate limits, to their own courts, not to us.

*Id.* at 841. "Our task," the Court went on to explain, "is the more modest one of assessing the sufficiency of the evidence within the framework of New York decisions on the award of punitive damages for recklessness." *Id.* at 841–42. "As to this," the Court stated, "we are convinced that the consequences of imposing punitive damages in a case like the present are so serious that the New York Court of Appeals would subject the proof to *particularly careful scrutiny.*" *Id.* at 842 (emphasis added).

With this said, the Court proceeded to explain the following with respect to the burden of proof pertaining to punitive damages:

New York demands, as it might have to before punishing a defendant with fines similar to those imposed on a criminal charge, that the quality of conduct necessary to justify punitive damages must be

---

2. Moreover, it is interesting to note that the clear and convincing charge given by the district court in the *Roginsky* case was very possibly a result of the fact that the underlying fraud claim had to be proven by clear and convincing evidence. *See*

*Simcuski v. Saeli,* 44 N.Y.2d 442, 452, 406 N.Y.S.2d 259, 265, 377 N.E.2d 713, 718–19 (1978); *Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 10, 330 N.Y.S.2d 33, 39, 280 N.E.2d 867, 871 (1972).

'clearly established.' *Cleghorn v. New York Cent. & H.R.R.R.*, 56 N.Y. 44, 48 (1874). *Cf. Hedrick v. Jebiley,* 198 N.Y.S.2d 346 (City 1960). As the Supreme Court has recently reminded us, the standard of proof 'by clear, unequivocal and convincing evidence ... is no stranger to the civil law.' *Woodby v. I.N.S.,* 385 U.S. 276, 285, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966), citing 9 Wigmore, Evidence § 2498 (3d ed.1940). It would be hard to think of a situation more appropriate for invoking that standard than where the manufacturer of a new drug honestly believed to assist in prolonging human life is faced with claims for penalties by hundreds of plaintiffs running into millions of dollars, in addition to many millions more for damages sustained. We have little doubt that in such a case the New York Court of Appeals would require a judge to scrutinize the evidence in far closer detail before submitting punitive damages to a jury than it would on an issue of compensatory damages for negligence or breach of contract. If that prophecy should prove to be wrong, we would then be obliged to decide in future cases whether we nevertheless have power to impose a higher standard of proof for the award of punitive damages in a federal trial, *cf. San Antonio v. Timko,* 368 F.2d 983, 985 & n. 1 (2d Cir.1966), as we surely would if we do.

*Id.* at 850–51. These words reveal that the Court viewed *Roginsky* as a unique circumstance warranting unique judicial measures. Despite the fact that its language regarding the New York standard of proof is couched in general terms, and is not explicitly limited to the unique circumstances which the Court faced in *Roginsky,* the Court's citation to an 1874 Court of Appeals opinion somewhat ambiguously calling for the "clearly established" standard and their disregarding of the more recent and less ambiguous Court of Appeals decision in *Corrigan v. Bobbs–Merrill Co.,* 228 N.Y. 58, 126 N.E. 260 (1920), which clearly called for the preponderance standard, is questionable. *See Corrigan,* 228 N.Y. at 66, 126 N.E. 260 ("In order to recover punitive damages, plaintiff was bound to satisfy the jury by a fair preponderance of the evidence....").

In short, although the *Roginsky* opinion does provide a credible argument that the Second Circuit supported the clear and convincing standard for establishing punitive damages—at least in the product liability context—it cannot be squared with a more recent Second Circuit case that suggests that the appropriate standard of proof for punitive damages is preponderance of the evidence.

█ In 1990, the Second Circuit decided in *Simpson v. Pittsburgh Corning Corp.,* 901 F.2d 277 (2d Cir.1990) the question of what level of proof was constitutionally required in order to impose a punitive damages award. In *Simpson* —a product liability case, just as *Roginsky* —the Second Circuit acknowledged, as did the appellant before it, that "the burden of proof under New York law for punitive damages in product liability cases is preponderance of the evidence, ..." *Simpson,* 901 F.2d at 282. The Court did not cite or mention *Roginsky* 's contrary authority on this issue, although its citation to *Roginsky* in a different context reveals that it was aware of the opinion. *See id.* (discussing *Roginsky* in related context). The Court instead addressed the appellant's argument that even though the preponderance standard was the correct standard under New York law, "due process requires use of the higher standard of 'clear and convincing evidence.' " *Id.* The Second Circuit rejected that argument, explaining that:

[T]hough we have not explicitly ruled in the past that a "preponderance" burden of proof satisfies due process, we believe that our toleration of that burden in numerous punitive damages cases makes it inappropriate for us to discard it now on constitutional grounds, just as we declined to abandon traditional formulations of the standards governing punitive damages awards in *Racich.* If a higher burden of proof is to be required, such a change "is best left for Congress of for higher judicial authority." *Racich v. Celotex Corp.,* 887 F.2d at 399.

*Simpson's* acceptance of the preponderance standard as a fundamental premise underlying its opinion, coupled with its rejection of the appellant's (and the instant defendant's) argument that federal due process requires a

higher standard, leaves this Court with a clear directive: apply preponderance of the evidence with respect to New York law on punitive damages. Although the defendant attempts to discount the obvious weight of *Simpson* by calling it a misreading of *Racich*, I cannot so excuse the wise counsel of my colleagues on the Court above me, particularly when they are applying a legal standard that has more recently been sanctioned by the New York Court of Appeals, *see Corrigan*, 228 N.Y. at 66, 126 N.E. 260 (applying preponderance standard) than the standard articulated in the more dated case provided by the defendant. *See Cleghorn*, 56 N.Y. at 48. Hence, I find that the preponderance standard is the appropriate standard under New York law.

### 3. *General Observations About New York Law*

■ Moreover, my finding on this question is bolstered by two observations about the law in this area. The first is that no matter the extent of the confusion and disagreement on the appropriate standard of proof for punitive damages under New York law, there is no ambiguity regarding the fact that under New York law, punitive damages are not a separate cause of action. *See* N.Y.Jur.2d Damages § 174. They are inextricably linked to the underlying cause of action. *See Rocanova v. Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603, 616–17, 612 N.Y.S.2d 339, 344–45, 634 N.E.2d 940, 944–46 (1994) (providing that "[a] demand for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action such as fraud.") (citing cases). Hence it is difficult to justify subjecting only one form of damages to a different evidentiary standard than all of the other elements of the claim at issue—at least without clear direction from either a statute or controlling judicial authority. Given that there is no such clear direction here, it is more reasonable to apply the same burden of proof with respect to one aspect of a claim as is applied to other aspects of the claim.

Because most courts rarely specify the burden of proof they are employing on a punitive damages question, it is hard to demonstrate an identifiable pattern in this regard. However, in her memorandum in opposition to defendant's motion, plaintiff demonstrates how at least in the libel context, courts have made a practice of applying the same burden of proof on a punitive damages question as on the underlying claim for liability. (Pl.Pun.Dam.Mem. at 3–6). Plaintiff contrasted the pre-*Sullivan* libel case of *Corrigan* —which applied the preponderance standard—with the post-*Sullivan* libel case of *Mahoney v. Adirondack Publishing Co.*, 71 N.Y.2d 31, 40, 523 N.Y.S.2d 480, 484, 517 N.E.2d 1365, 1369–70 (1987) [3], which invoked the clear and convincing standard which became *Sullivan* required Plaintiff explains that "by comparing *Corrigan* with *Mahoney*, it is apparent that the burden of proof for the underlying claim sets the burden of proof for punitive damages." (Pl. Pum.Dam.Mem. at 5). Although this is scant evidence, in light of the general trend in the law to subject all elements of a claim to the same burden of proof, I agree with plaintiff on this question.

■ The second observation about New York law supporting the Court's conclusion on this issue is the infrequency with which New York law imposes heightened burdens of proof. As Justice Friedman recently expounded, "[i]n general, New York has only imposed a higher standard of proof in a limited class of cases in instances such as the denial of personal or liberty rights, particularly important personal interests area at stake, or to establish certain interests in realty, fraud, and the like." *Gold Fields American Corp. v. Aetna Casualty & Surety Co.*, N.Y.L.J., Aug. 7, 1997, at 25 (N.Y.Sup. Ct. Aug. 7, 1997). In summary, I am persuaded that the standard addressed in *Corrigan*, a 1920 Court of Appeals decision, and in *Simpson*, a 1990 Second Circuit opinion, is the appropriate standard, particularly in light of the other principles of New York law that impel this result. Therefore, the Court determines that until one of these higher authorities elects to address the question, the preponderance of the evidence standard should apply to punitive damages deliberations under the New York City Administrative Code.

---

**3.** *See also Frechette v. Special Magazines*, 285 A.D. 174, 176–77, 136 N.Y.S.2d 448, 451 (3rd

Dept.1954) (pre-*Sullivan* libel case also applying preponderance standard to punitive damages).

Because the substantive standard for punitive damages is the same for the federal and state charges that were submitted to the jury, and because the jury awarded a verdict under the federal preponderance standard, I hereby impose punitive damages against the defendant under New York City Administrative Code in the amount that the jury determined under Title VII: $1,250,000.00.

## B. Cap on Punitive Damages under Title VII

■ The Civil Rights Act of 1991 imposes a statutory cap on punitive damages awarded under Title VII. This statutory cap varies according to the size of the defendant company, which is measured by the number of its "employees." For defendants who employ "more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year," the cap on compensatory and punitive damages is $50,000.00 in damages under Title VII. See 42 U.S.C. § 1981a(b)(3). As the defendant emphasizes, there is no dispute in this case that the number of employees employed by the defendant SNY falls within this statutory range, and thereby restricts plaintiff to the recovery of $50,000.00. The real question, however, is whether, for purposes of determining the appropriate statutory cap on punitive damages, the plaintiff may count the employees of SNY's parent company in Sweden, Svenska Handelsbanken AB ("SHB"). I conclude that plaintiff may not.

First, it must be underscored that SNY's parent company, SHB is *not* a defendant in this action, nor under the law could it be. Section 2000e–1(c)(2) clearly provides that Title VII's dictates "shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer." 42 U.S.C. § 2000e–1(c)(2). In this case, if any controlling relationship between SNY and SHB could be established, it is SHB that controls SNY and not the reverse. Therefore, SHB is not subject to Title VII because it is unquestionably a foreign corporation that is "not controlled by an American employer." *Id.*

Second, and perhaps more importantly, non–U.S. citizens employed outside of the United States are not deemed "employees" as that term is defined under Title VII. In fact, they are explicitly excluded under the Act. See 42 U.S.C. § 2000e(f) ("With respect to employment in a foreign country, such term ["employee"] includes an individual who is a citizen of the United States."). Hence, even if SHB could be considered an employer, its non–U.S. citizen employees could not be deemed "employees" under the act, and therefore presumably could not be counted toward the aggregate number of employees for purposes of the statutory cap on punitive damages. This argument is a matter of simple statutory construction. If the non-U.S. citizens employed by SHB abroad are not "employees" under the Act, then they likewise should not count as "employees" under the Act's calculations of punitive damages cap. See *Matimak Trading Co. v. Khalily*, 118 F.3d 76, 83 (2d Cir.1997) ("The same terms used in the same statute should get the same meaning."); *Yerdon v. Henry*, 91 F.3d 370, 376 (2d Cir.1996) ("Because 'the meaning of statutory language, plain or not, depends on context,' the interpretation of a statute requires consideration of the language of the relevant provision in conjunction with the entire statute.") (citation omitted); *United States v. Hopkins*, 53 F.3d 533, 541 (2d Cir.1995) (providing that "a term that appears in several places in 'the same statute should generally be construed the same way each time it appears.'"), *cert. denied,* —— U.S. ——, 116 S.Ct. 773, 133 L.Ed.2d 725 (1996).

Plaintiff contends that despite the fact that SHB is not controlled by SHB, it might nevertheless be deemed an "employer" under Title VII because its management decisions so directly affect SNY's hiring and firing practices. Plaintiff points to *Goyette v. DCA Advertising, Inc.*, 830 F.Supp. 737 (S.D.N.Y. 1993) to support this contention.

In *Goyette,* Judge Conboy found that a foreign parent corporation, Dentsu, had so "significantly affected the subsidiary's employment policies,"[4] *id.* at 744, that it should

4. The Court wrote:
Dentsu explicitly ordered DCA not to fire any Dentsu expatriates. Moreover, Dentsu regulat- / ed the terms of the expatriates' employment. Although Dentsu maintained that it had no specific involvement with the plaintiffs' termi-

be deemed an employer for purposes of Title VII. The court did not address, however, the above-quoted passage from Title VII relating to foreign corporations; nor did the court appear to base its holding on any contrary provision of Title VII or its legislative history. Rather, the court in *Goyette* relied upon Second Circuit case law which had established that for agency purposes, an entity could be deemed an employer under Title VII if such a party "significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer' of an aggrieved individual as that terms has generally been defined at common law." *Goyette*, 830 F.Supp. at 744 (quoting *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir.1982)).

Notably, all of the cases cited by the *Goyette* court were cases involving solely domestic corporations. The Second Circuit case upon which *Goyette* chiefly relies, *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir.1982), *cert. granted & judgment vac'd*, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), was a case involving purely local entitles. Clearly, then, it is unclear—despite the *Goyette* court's holding—that such agency principles can be imputed into the foreign corporation context, especially in light of Congress' clear direction to the contrary in Section 2000e–1(c)(2).

The more critical distinction between *Goyette* and the instant case, however, is that the foreign parent corporation in *Goyette* was a named defendant in the action. In the instant case, plaintiff only named SNY as a defendant; she brought no claims against SHB. Under these circumstances, it would be inappropriate to sanction a post hoc argument that SHB is an "employer"—even if such an argument were limited merely to damages, and not liability, under the Act. Because SHB was never given an opportunity to enter into the action and defend its interests, plaintiff should not now be permitted to base its punitive damages argument on SHB's purported "employer" status. *See,*

*e.g., Russell v. Midwest–Werner & Pfleiderer, Inc.*, 955 F.Supp. 114, 114 (D.Kan.1997) ("Having never named [the foreign parent corporation] in her suit, the plaintiff does not address how [it] now can be considered a 'respondent.'").

Finally, and most importantly, plaintiff's reliance on *Goyette* is mis-thought to the extent that even in *Goyette* the Court counted towards the statutory minimum only the number of employees employed by the U.S. subsidiary—it did not count the total number of employees employed internationally by the parent corporation. Under these circumstances, I do not find *Goyette* to be persuasive authority for the proposition that SHB's employees should be counted toward plaintiff's calculation of the appropriate punitive damages cap. Rather, it supports this Court's conclusion that foreign employees should not be counted toward the statutory minimum for damages under Title VII.

Plaintiff finally argues that despite the language in the statute, for policy reasons, this Court should include SHB's employees for purposes of calculating the statutory cap on punitive damages. Plaintiff contends that such a result is necessary to preserve the punitive nature of the damages, and to calibrate the damages to the defendant's financial resources. *See, e.g., Marfia v. T.C. Ziraat Bankasi, New York Branch*, 903 F.Supp. 463, 472 (S.D.N.Y.1995) (rejecting the defendant's argument that the New York branch office should be treated as a separate entity from the international parent entity—without addressing the argument that foreign corporations are excluded under Title VII—and holding that the $1 million punitive damages award was not unreasonably high in light of the vastness of the parent's enterprise and wealth.), *vac'd and rem'd on other grounds*, 100 F.3d 243 (2d Cir.1996). However, plaintiff is reminded that this Court does not generate policy—Congress does. And on this question Congress has spoken with a clear voice. It must be left to Congress to change its policy determination if it believes

nations, the expatriate policy that Dentsu dictated had an impact on all DCA employees because it affected who was to be fired in the downsizing at DCA. We believe that this general labor policy, which Dentsu imposed on

DCA, creates an adequate nexus by which the Court may hold Dentsu to be an employer for purposes of Title VII.
*Goyette*, 830 F.Supp. at 744.

that such a result is contrary to the complicated purposes of the Act.

In conclusion, I note that this result is consistent with case law that provides that, at least for jurisdictional purposes, "foreign employees of a foreign corporation do not count towards the statutory minimum required under ... Title VII." *Kim v. Dial Service Int'l, Inc.,* 1997 WL 5902, *3 (S.D.N.Y.1997) (citing cases); *Robins v. Max Mara, U.S.A., Inc.,* 914 F.Supp. 1006, 1010 (S.D.N.Y.1996) (same); *Minutillo v. Aqua Signal Corp.,* 1997 WL 156495 (N.D.Ill.1997) (explaining that Title VII excuses from coverage foreign corporations not controlled by an American employer and holding that for jurisdictional purposes therefore, "only a foreign corporation's United States employees may count toward the jurisdictional minimum."); *Rao v. Kenya Airways, Ltd.,* 1995 WL 366305, *2 (S.D.N.Y.1995) (providing that "it is plain that the foreign employees of a foreign corporation are not considered employees for purposes of [Title VII] and that [p]laintiff may not, therefore, include defendant's foreign employees in calculating defendant's total number of employees."). I can not justify a contrary holding under the punitive damages cap provision of the Act. *See Russell v. Midwest–Werner & Pfleiderer, Inc.,* 955 F.Supp. 114 (D.Kan.1997) (holding that "the employees of [the foreign parent corporation] are not counted towards the statutory damage cap because foreign employees employed abroad are not employees, § 2000e(f), and because Title VII does not apply to a foreign employer's foreign operations unless controlled by an American employer, § 2000e–1(c)(2).").

## II. Prejudgment Interest

■ Prior to trial, it was agreed by and between the parties and the Court that if the jury awarded plaintiff front pay damages, the Court would perform the task of discounting those damages to present value. (*See* Tr. at 1671.) In fact, in the jury charge, on the question of front pay, the jury was instructed: "[i]f you do award front pay, that is damages for lost future earnings, you are not to make any deductions to discount any such award to present value. The parties have agreed that I will do any discounting to present value that may be required." (Jury

Charge at 46; Tr. at 2018). Now, after the jury has declined to award front pay damages, the plaintiff contends that the Court should grant prejudgment interest on the jury's back pay award. Contrary to plaintiff's repeated suggestions, however, such was never the agreement between the Court and the parties before trial; the Court only agreed to discount a future pay award—not to calculate prejudgment interest on a back-pay award.

Moreover, and more importantly, the jury was presented with considerable testimony on prejudgment interest and was never instructed that such testimony should be excluded from their deliberations. Hence, I find that such interest was undoubtedly included in their verdict for back pay.

In Joint Exhibit 26, for example, plaintiff provided her own calculations of back pay damages as well as a line for prejudgment interest corresponding to each year of alleged discrimination. And, as defendant underscores in its memorandum, during her direct examination "[p]laintiff's counsel deliberately led her through these damages calculations and asked her specific questions about prejudgment interest, including her selection of a rate of 9%." (Def.Mem.Opp.Pl. Front Pay at 24; *see also* Tr. at 710, 716–18). Then, at the Court's request, plaintiff submitted a copy of the calculations she made during a lunch break which set forth the prejudgment interest owed to her on the back pay through April 1997. This was brought to the jury's attention, and sent into the jury room as Plaintiff's Exhibit 115. As plaintiff's counsel led her through a discussion of Exhibit 115, the following testimony was elicited:

Q. These calculations added to your prior calculations would represent your *entire back pay claim,* is that correct?

A. That's correct.

Tr. at 735 (emphasis added). Clearly, from this testimony the jury understood that plaintiff's claim for back pay necessarily included calculations for prejudgment interest.

Plaintiff, however, contends that the following exchange during defendant's economist's testimony confused the question and allowed the jury to believe, as did plaintiff,

supposedly, that the issue of prejudgment interest was removed from the jury's discretion:

> Q. Can you tell the court and the jury how [sic] your methodology for calculating the value of past money to today's value?
> MR. D. SAPIR: Objection, your Honor.
> THE COURT: Sustained. I told you yesterday, the parties have agreed that issues of discounting to present value, which is a question that will have to be done with whatever award you render, they have agreed to let me decide that later. What are you coming to now?

Tr. at 1677 (cited in Pl. Reply Mem. on Front Pay at 7). However, plaintiff quotes this testimony, and the Court's ruling on the objection, out of the context which otherwise clearly demonstrates the Court's consistent distinction between present valuing of front pay awards—which the Court would decide—and allotting prejudgment interest for back pay awards—which was given to the jury to decide. In the words immediately following the Court's question, "What are you coming to now?" from the above-quoted passage, the dialogue continued:

> MS. PATALKIS: What I am coming to now, your Honor, is that on the plaintiff's case the plaintiff was permitted to give a figure for valuing past sums to today's value, and I thought when we left it yesterday that we would be able to address that issue and not the other issue of how you deal with future money and valuing it to today's money.
> THE COURT: Limit it to that.
> MS. PATALKIS: That is exactly what we are talking about.
> THE COURT: Okay.

Tr. at 1677. Thereafter, the defendant's expert also testified as to her calculation of back pay with interest included. What this exchange demonstrates is that the Court allowed to be presented to the jury testimony on the question of prejudgment interest on back pay damages, but that the Court was excluding testimony on the discounting to present value of any front pay award because the parties had decided that decision was exclusively within the Court's province.

As the jury deliberated, it specifically requested Joint Exhibit 26, Plaintiff's Exhibit 115 and a calculator. As defendant writes, "[t]he only rational conclusion to be drawn from these requests, the evidentiary record developed by the plaintiff and the precision of its back pay award year-by-year is that the jury included prejudgment interest in its verdict." (Def. Mem. Opp. Pl. Front Pay at 28). I agree.

In sum, although the verdict sheet and charge might have been clearer on this question had it explicitly asked the jury for prejudgment interest calculations, in light of the ample testimony and argument provided to the jury on this issue, see Jt.Ex. 26; Pl.Ex. 115; Tr. at 710, 716–18; 735, as well as the absence of an instruction telling the jury to ignore the testimony—as it was instructed to do with respect to discounting front pay to present value—I cannot accept plaintiff's suggestion that the jury did not factor prejudgment interest into its back pay award. In short, I find that the jury's back pay award included their calculations of prejudgment interest.

### III. Front Pay or Reinstatement

#### A. *Reinstatement*

■ In an oft-quoted passage, Judge Weinfeld of this Court some years ago expounded upon the question of when reinstatement is appropriately awarded under Title VII:

> Like the other remedies available under Title VII, reinstatement is not mandatory upon a finding that an employee has been discriminatorily discharged, but is an equitable remedy whose appropriateness depends upon the discretion of the court in the light of the facts of each individual case. However, since the purpose of reinstatement is to make the plaintiff whole for the injury she has suffered, it, like back pay, should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.

*EEOC v. Kallir, Philips, Ross, Inc.*, 420 F.Supp. 919, 926–27 (S.D.N.Y.1976), *aff'd*, 559

F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277, (1977).

Although plaintiff's complaint requested reinstatement as a potential equitable award, and that request was reiterated by plaintiff in the Joint Pre–Trial Order, I agree with defendant that plaintiff did not begin to pursue this relief until after the jury declined to award her front pay. However, plaintiff maintains that such was the proper course of action because reinstatement is an equitable remedy that is properly taken up by the Court post-trial. For these purposes, I will accept plaintiff's argument on that point.

However, on two alternative grounds, I nonetheless deny plaintiff's request for reinstatement. The first is that there is clearly too much animosity between the parties for such relief to be appropriate. *See, e.g., Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728 (2d Cir.1984) (recognizing that "[r]einstatement may not always be possible," especially where "the employer-employee relationship may have been irreparably damaged by animosity associated with the litigation."). Even if plaintiff's anger over the discrimination has cooled—which I doubt, in light of her tone at trial and in light of her counsel's post-trial press releases—I nevertheless find that her working relationship with those at SNY has been irreparably damaged by this litigation. Moreover, there was ample evidence adduced at trial that the rancor between plaintiff and her superiors in defendant's employ far predated this action. To replace plaintiff in defendant's employ would create a potentially volatile situation in which neither party would likely thrive.

As Judge Weinfeld explained in the case quoted above, which presented similar questions:

> [T]he job from which plaintiff was discharged required a close working relationship between plaintiff and top executives of defendant. It also involved frequent personal contact with defendant's clients, with plaintiff acting as defendant's representative. Lack of complete trust and confidence between plaintiff and defendant could lead to misunderstanding, misrepresentations and mistakes, and could seriously damage the defendant's relationship with its clients. The situation here is quite unlike that presented when reinstatement

is sought for an assembly line or clerical worker, or even for an executive whose job is not as sensitive for his employer's interests as is plaintiff's job here. The Court is convinced that after three and a half years of bitter litigation the necessary trust and confidence can never exist between plaintiff and defendant. To order reinstatement on the facts of this case would merely be to sow the seeds of future litigation, and would unduly burden the defendant.

*EEOC v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919, 926–27 (S.D.N.Y.1976), *aff'd,* 559 F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277, (1977); *see also Pruzan v. Hias, Inc.,* 1986 WL 1182, at *1 (S.D.N.Y.1986) (same). Under these acrimonious circumstances, and given the highly sensitive nature of plaintiff's prospective position—where she would be dealing directly not only with defendant's clients, but also with vast amounts of their wealth—it would be unwise to grant reinstatement as an equitable remedy.

In the alternative, I concur with the jury's conclusion that an award of back pay sufficiently makes plaintiff whole for injuries sustained as a result of defendant's discrimination. Plaintiff has found what I deem to be comparable employment and the jury has awarded her remuneration in its back pay award for roughly two years of discrepancy between her appropriate salary with defendant and her salary in her new job. Any reinstatement under these circumstances would therefore represent an impermissible windfall to plaintiff. *See McIntosh v. Irving Trust Co.,* 873 F.Supp. 872, 879–80 (S.D.N.Y. 1995) (providing that "while this Court may not be bound to deny reinstatement because the jury denied front pay, the jury's verdict lends significant support to this Court's independent conclusion that the plaintiff already has been made whole and that, in the exercise of discretion, reinstatement should not be awarded"). For these reasons, I deny plaintiff's request for reinstatement.

### B. *Front Pay*

Like reinstatement, "[f]ront pay is an equitable remedy that may be awarded in the court's discretion." *Rao v. New York*

*City Health & Hosps. Corp.*, 882 F.Supp. 321, 331 (S.D.N.Y.1995). The Second Circuit has written that front pay is recommended "where reinstatement is inappropriate and the plaintiff has been unable to find another job, in order to make victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1182 (2d Cir.1996) (internal quotations and citations omitted). Plaintiff's equitable claim for front pay under Title VII, however, falls prey to the same problem as her request for reinstatement, and to the same factual difficulties alluded to by the Second Circuit in *Reed.*

First, as noted above, plaintiff has not only found comparable employment, but she appears to be secure there.[5] Hence, under these circumstances, I cannot conclude that plaintiff has "no reasonable prospect of obtaining comparable alternative employment." *Reed,* 95 F.3d at 1182. For this reason, and because it is appropriate to give some deference to a jury's conclusion on factual questions resolved pertaining to legal questions, *see Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1048 (2d Cir.1992) (Because "when legal and equitable actions are tried together, the right to a jury in the legal action encompasses the issue common to both," "[i]t is clear that a judge sitting at equity may not render a verdict which is inconsistent with that of a jury sitting at law on a claim involving the same essential elements."), I concur in the jury's finding that an award of front pay is not necessary to make plaintiff whole—particularly where her back pay award granted her compensation for approximately two years after her termination with defendant.

In the alternative, I find, as the jurors most likely did in refusing to award plaintiff front pay, that in light of the nature of the market at issue, as well as the financial instability of the defendant company itself, not to mention Mrs. Greenbaum's own prospects for future advancement, an award of front pay would be unduly speculative in this case, and hence her request for front pay should be denied on that basis as well. *Reed,* 95 F.3d at 1182 (providing that front pay is appropriate where the factfinder has some basis to "reasonably predict" plaintiff's chance for obtaining comparable employment).

## CONCLUSION

For the reasons set forth above, plaintiff is hereby awarded $1,250,000.00 in punitive damages under the New York City Administrative Code because I have found the preponderance standard to apply to her claim of punitive damages under the Code. Plaintiff's punitive damages under Title VII, however, are hereby capped at $50,000.00, pursuant to the statutory cap imposed by the Civil Rights Act of 1991. Plaintiff's further requests for prejudgment interest, reinstatement, and front pay are denied. Plaintiff's request for attorneys' fees will be taken up at a later date by this Court. The Clerk of the Court is hereby directed to enter judgment in this action consistent with the jury verdict and this Opinion.

**SO ORDERED.**

---

5. Plaintiff's salary with her new employer is lower than it was with defendant, but this fact alone does not render her present employment incomparable. She is employed in the same field, doing extremely similar work at a similar title. I cannot find that this is a situation in which plaintiff should be further compensated. *See, e.g., Bonura v. Chase Manhattan Bank, N.A.,* 629 F.Supp. 353, 362 n. 3 (S.D.N.Y.1986) ("Where, as here, the Court is not persuaded in the first place that plaintiffs require front pay to be made whole, it would be particularly inappropriate to speculate as to what plaintiffs' future earnings could *or should* be. Based on its appraisal of plaintiffs' respective employment opportunities, as well as the periods of front pay sought and the speculative projections that calculation of such front pay awards would require, the Court declines to award front pay. . . .") (emphasis added).