Ronald WEST and Daphne West, as Husband and Wife, Plaintiffs,

v.

THE GOODYEAR TIRE & RUBBER COMPANY and The Budd Company, Defendants.

No. 92 Civ. 0938(RO).

United States District Court, S.D. New York.

July 22, 1997.

Edward J. Lackaye, of counsel, Poughkeepsie, NY, Aaron N. Woods, of counsel, Risjord & James, Overland Park, KS, for Plaintiffs.

Clausen, Miller, P.C., Michael W. Duffy, of counsel, Chicago, IL, for The Budd Company.

Gallagher, Gosseen & Faller, Alan D. Kaplan, of counsel, Garden City, NY, for Goodyear Tire and Rubber Co.

*MEMORANDUM AND ORDER*

OWEN, District Judge.

Plaintiff Ronald West [1] was injured in 1991 by an exploding tire when he mounted a 16" tire manufactured by defendant Goodyear Tire & Rubber Company ("Goodyear") on a 16.5" wheel manufactured by defendant The Budd Company ("Budd"). Plaintiffs seek from each defendant $2,000,000 in compensatory damages and $5,000,000 in punitive dam-

---

1. Mr. West died on November 19, 1996 and his wife Daphne West has been substituted as party for her late husband.

ages. Defendants bring a motion *in limine* to strike plaintiffs' claim for punitive damages which I will treat as a motion for summary judgment pursuant to Rule 12(b).[2]

West was the owner of a body shop which he operated since the mid–1970's. On January 5, 1991, a customer asked West to mount two tires for use on his pick-up truck. The tires were clearly marked "16LT" indicating that they were 16" light truck tires. There was also a warning embossed in small black letters on the black rubber of the tire which said: "Mount only on 16" rims." West, however, believing them to be 16.5" tires, neglected to check the size and proceeded to mount the tires on two 16.5" rims which he had in his shop. West claims that he inflated the first tire without incident, but when he mounted the second and filled it with air, it exploded, causing injuries to West's hand which resulted in ten days of hospitalization, three surgical procedures, and alleged residual hand damage. The 16.5" rim was manufactured by Budd in 1980. The exploding 16" tire was manufactured by Goodyear in 1986 and contained a multi-strand weftless bead[3] constructed of wires with a diameter of .037".

In his deposition, West stated that he thought that the tires he was given to mount were 16.5" because the customer owned a pick-up truck and West believed that all pick-up trucks were equipped with 16.5" tires. This belief, according to West, was based on the fact that West himself owned a pick-up truck in 1987 or 1988 which was equipped with 16.5" tires. West states that he was altogether unaware of the existence of 16" tires despite the fact that, at the time of the accident, he himself also owned a 1984 pick-up truck equipped with 16" tires.

West further stated that the only accidents resulting from exploding tires of which he was aware involved split rims on bigger trucks. West, of Jamaican birth, while English speaking, asserts that he is not a good reader and also asserts that he was not aware of any safety information generally printed on tires and rims. He did admit receiving some information from tire and rim manufacturers, although West stated he could not really read the printed material and so he piled it up and discarded it.[4]

In addition to compensatory damages for the hand injury, plaintiff claims that defen-

---

**2.** Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party has the burden to demonstrate the absence of a material factual dispute. *Witter v. Abell–Howe Co.*, 765 F.Supp. 1144, 1147 (W.D.N.Y.1991). This can be done "merely by pointing out that there is an absence of evidence to support the nonmoving party's case," all ambiguities being resolved in the nonmoving party's favor. *Pfizer Inc.v. Astra Pharmaceutical Products, Inc.*, 858 F.Supp. 1305, 1317 (S.D.N.Y. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986)). In order to defeat the motion for summary judgment, the non-movant, here plaintiff, must competently make a "showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.).

**3.** The bead of the tire is the metal strand running through the inside diameter portion of the tire which contacts the rim when the tire is mounted and inflated. The bead provides the tensile strength to secure the inflated tire on the wheel. A multi-strand weftless bead or strap bead con-

sists of a series of bead wires compounded into a ribbon which is then wrapped a number of times.

**4.** Defendants claim that plaintiffs do not even have a case for liability much less for punitive damages. West had been in the automobile business for 30 years at the time of the accident and he had owned his own business for 15 years. He admitted in his deposition that he knew how to look for the size of rims and the size of tires and that he knew where on each item he had to look for the respective sizes. He also admitted that he knew the size of the rim that he used to be 16.5" but neglected to look at the information on the tire to confirm its size despite the fact that he knew where to look for it. It is uncontested that the tire was clearly labeled "16LT" to indicate the size of the tire and also that the tire has a warning embossed in small letters on the tire itself which warns the user to mount the tire only on a 16" rim.

Defendant also points out that in most of the other so-called mismatch litigation in the past, the basis for the claim was that the user did not know that the rim was 16.5". Here, Mr. West knew it was a 16.5" rim and he also knew where to look on the tire to see if the tire size matched. When asked what he would have done if he had seen the "16LT" embossed on the tire indicating that it was a 16" tire, he admitted that would not have mounted that tire on the rim.

dants are liable for punitive damages because: 1) both Goodyear and Budd knew that a mismatch problem between 16″ tires and 16.5″ rims existed for some years before this particular rim and tire were manufactured; 2) defendants failed to provide feasible alternatives or remedies for the mismatch hazard; and 3) defendants failed to offer adequate warnings regarding the potential for mismatch and the possibly deadly results of a mismatch. Plaintiff asserts that such conduct was "wilful, wanton, reckless, malicious, fraudulent, and intentional in the disregard of the safety of the plaintiff and the public."

■■■ The standard for an award of punitive damages in New York is a demanding one. Plaintiff must show the defendant's conduct to be "so reckless or wantonly negligent as to be the equivalent of a conscious disregard of the rights of others" and that the conduct demonstrates a "high degree of moral culpability." *Rinaldo v. Mashayekhi,* 185 A.D.2d 435, 585 N.Y.S.2d 615 (3d Dept. 1992) (citations omitted). In *Roginsky v. Richardson–Merrell, Inc.,* 378 F.2d 832, 842–43 (2d Cir.1967) (citations omitted), the Second Circuit noted that New York courts have used a variety of phrases to describe the "moral culpability" that will support punitive damages for nonintentional torts including: "utter recklessness," *Caldwell v. New Jersey Steamboat Co.,* 47 N.Y. 282, 296 (1872); "reckless and of a criminal nature, and clearly established," *Cleghorn v. New York Cent. & H.R.R.R.,* 56 N.Y. 44, 48 (1874); "wanton or malicious, or gross and outrageous" or "a design to oppress and injure," *Powers v. Manhattan Ry.,* 120 N.Y. 178, 182, 24 N.E. 295 (1890); "conscious indifference to the effect of his acts," *Gostkowski v. Roman Catholic Church of the Sacred Hearts of Jesus and Mary,* 262 N.Y. 320, 323, 186 N.E. 798 (1933); action "committed recklessly or wantonly, i.e., without regard to the rights of the plaintiff, or of people in general," *Soucy*

*v. Greyhound Corp.,* 27 A.D.2d 112, 276 N.Y.S.2d 173, 175 (3d Dept.1967). In summary, the Second Circuit held that "[t]he recklessness that will give rise to punitive damages must be close to criminality" and like criminal behavior, it must be "clearly established." *Roginsky* 378 F.2d at 843 (2d Cir.1967) (citations omitted). In *Karen S. v. Streitferdt,* 172 A.D.2d 440, 568 N.Y.S.2d 946, 947 (1st Dept.1991) the court stated "even where there is gross negligence, punitive damages are awarded in 'singularly rare cases' such as cases involving an improper state of mind or malice or cases involving wrongdoing to the public." (citations omitted).

Plaintiffs claim that defendants' actions meet this standard of moral culpability and at trial they plan to support this claim through the testimony of an expert witness as well as documents offering a detailed history of the 16″/16.5″ mismatch problem which began in the early 1970's. The first documented mismatch explosion of a 16″ Goodyear tire with a 16.5″ wheel occurred on August 13, 1971 and since then, plaintiff claims that Goodyear has been involved in at least 25 mismatch cases. The initial mismatch occurrence involving a Budd 16.5″ rim took place on May 28, 1975 and since that time, plaintiff claims that Budd has been implicated in 142 similar mismatch claims.[5]

Plaintiffs also claim that both Goodyear and Budd were on notice of the mismatch problem through their participation in trade associations—The Tire and Rim Association ("TRA") and the Rubber Manufacturers Association ("RMA")—where the mismatch dilemma was discussed as early as May 1972 at the TRA Board of Trustees meeting. Plaintiffs further claim that, despite defendants' knowledge of the problem, they failed to take adequate action.

For example, plaintiffs maintain that safer and feasible alternative designs for the tire

---

5. On oral argument, plaintiffs acknowledged that Budd would dispute the figure of 142 similar cases. Both parties appear to accept the fact that at least 100 occurrences of mismatch have occurred involving 16″ tires and 16.5″ rims from the early 1970's to the present but for purposes of this motion, I will credit plaintiff's figure of 167 incidents.

In their papers, plaintiffs list the names of the victims in the alleged Goodyear and Budd cases, but do not indicate what kind of injuries resulted nor how many cases involved serious injury or death. When asked by the court on oral argument for such detail, plaintiff was not able to provide the data.

and the rim were available to both manufacturers. Plaintiffs assert that Goodyear conducted tests in the 1970's which showed that tires manufactured with a hex bead [6] design coupled with a higher gauge wire would withstand higher pressure before breaking. They claim that changing the design of the tire bead using wires with a diameter greater that the .037 gauge wire utilized in the tire that exploded or using a single strand hex tire bead in place of the weftless multi-strand tire bead used in the exploding tire would have decreased the danger of explosion in the case of a mismatch. Moreover, plaintiffs assert that Goodyear was manufacturing 16″ *radial* tires with a single strand hex bead as early as the late 1970's and could therefore have used the same design in the 16″ bias ply *light* tires as well.

As to a feasible design modification of the 16.5″ rim to prevent the mounting of 16″ tires, plaintiffs claim in their statement of facts, without offering evidence, that safer alternative wheel designs were available to Budd. However, in their opposition papers, they recognize that the TRA's efforts to modify the 16.5″ rim were unsuccessful. They fault Budd, however, for introducing a 16.5″ rim into the U.S. market when 16″ tires already existed. Plaintiff also faults Budd for continuing to manufacture 16.5″ wheels for some years after 1979 when the TRA recommended that new programs produce only the 16″ wheel and tire system.[7]

Additionally, plaintiffs plan to offer expert testimony to show that both Goodyear and Budd failed to adequately warn users that both 16″ and 16.5″ rims and tires exist and that there is danger of mismatch; that if a 16″ tire is mounted on a 16.5″ rim there is a danger of explosive separation which could cause injury or death; and that defendants failed to recall or instruct users to discontinue use of 16.5″ rims and 16″ tires with multistrand weftless beads manufactured from wires of a diameter less than .050″. They claim that, while both the Goodyear tires and Budd wheels are size-stamped, nevertheless the warning embossed on Goodyear's 16″ tires is black on black and is too small to be noticed and, furthermore, does not inform the user that mounting a 16″ tire on a 16.5″ rim could result in death. They also contend that the fact that Budd declined to place a similar warning on its 16.5″ rims is evidence of morally culpable and reckless conduct.

As further proof of defendants' wanton and reckless conduct, plaintiffs offer the fact that when Japanese and Korean manufacturers were considering exporting 15.5″ wheels for use in the United States, defendants took action through their trade associations to discourage placement of half-size wheels in the U.S. market because of the potential for serious mismatch occurrences. Plaintiffs claim that this position was contradictory to Goodyear's conduct in the United States by failing to warn or instruct the U.S. public about the mismatch danger or to endorse the removal of their 16LT weftless multi-strand bead tires from the market.

Defendants contend that none of their behavior was wanton or reckless and was certainly not "close to criminality". I must agree. Plaintiffs' own evidence shows that, far from pushing the problem under the rug, defendants took measures to correct the mismatch issue. After the May 5, 1972 meeting of the TRA, to which plaintiffs refer, various wheel industry representatives considered stamping their wheels. Budd-made wheels were, however, during that time, and at all times subsequent, already size-stamped. Goodyear's 16″ tires are clearly marked "16LT" and have instructions embossed on

---

6. A hex bead is made of a single strand of wire with multiple turns which generally results in a hex configuration.

7. Budd points out that the TRA approved the introduction of the 16.5″ system and also notes that when the 16.5″ rim was originally developed, in the mid–1960's, it was difficult if not impossible to mount a 16″ tire on the larger rim because of the stiffness of the tires then in production. Budd also claims that the TRA's decision to discontinue the 16.5″ system was made, not primarily because of the prevalence of 16″/16.5″ litigation, but because the Metric Task Force of the TRA determined that there should be only one light truck wheel and tire assembly for *world-wide* use and decided on the 16″ system since the 16.5″ system was uniquely a U.S. program. Budd also states that the 16.5″ system is still available for use and 16.5″ wheels are being manufactured to this day for original equipment and aftermarket use.

them to mount 16″ tires only on 16″ rims. The fact that the lettering on the warning is small or the warning does not refer to possible death from explosion does not make Goodyear's conduct wanton or reckless.

Budd considered placing a similar warning on their 16.5″ rims but made a decision not to do so. They have, however, made significant efforts to educate those involved in tire servicing about the dangers of mismatch through their sales brochures, warning campaigns and publications—several samples of which were submitted to this court—as well as television, newspaper and radio spots. Furthermore, both Goodyear and Budd opposed the introduction of 15.5″ wheels by Japanese and Korean manufacturers and Budd made considerable efforts to persuade the Occupational Safety and Health Administration to modify its 1980 Standard to regulate the servicing of LT rims and tires because of the potential dangers of 16″/16.5″ mismatches.

■ As to Goodyear's failure to recall its 16″ tires containing weftless multi-strand bead of .037″ diameter wire, or Budd's failure to recall its 16.5″ rims, it is not as though these tires were defective in themselves or presented any danger to the public whatsoever if correctly mounted on a 16″ rim or that the rims were defective if properly matched with 16.5″ tires. In order to avoid punitive damages, it is not necessary that a manufacturer alter its own product or recall that product each time a different manufacturer, over whom it has no control, introduces a product into the market which creates the potential for an accident. Rather, it is only wanton or reckless conduct in relation to that product or the potential accident which will justify punishment.

Under New York penal law, in order to prove recklessness it must be shown that the defendant was aware of the risk and consciously disregarded it:

A person acts recklessly with respect to a result ... when he is aware of and *consciously disregards* a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross devi-

ation from the standard of conduct that a reasonable person would observe in the situation.

New York Penal Law § 15.05(3) (McKinney 1987)(emphasis supplied); *see also Roginsky*, 378 F.2d at 843 (holding punitive damages proper where manufacturer is shown "to have become aware of danger and to have done nothing; deliberately closing its eyes.") Plaintiffs cannot maintain that either Goodyear or Budd simply closed their eyes to the dangers of mismatch. Their own evidence demonstrates that defendants worked with others in the industry to prevent these occurrences including doing extensive testing and seeking to develop an alternative design for the 16.5″ wheel. The fact that they did not take all possible measures to employ alternative technologies, did not recall their products, or did not choose to use all possible methods of warning the public does not indicate that their conduct was morally culpable, reckless, or close to criminal.

Furthermore, the fact that Budd and Goodyear were aware of mismatch incidents in the past does not support a claim for punitive damages. The demanding standard for punitive damages was reaffirmed in *Camillo v. Geer*, 185 A.D.2d 192, 587 N.Y.S.2d 306, 309 (1st Dept.1992) which held that New York law provides for punitive damages only "for exceptional misconduct which transgresses mere negligence, as when the wrongdoer has acted maliciously, wantonly, or with a recklessness that betokens an improper motive or vindictiveness or has engaged in outrageous or oppressive intentional misconduct or with reckless or wanton disregard of safety or right" and holds that an award for punitive damages "must be supported by clear, unequivocal, and convincing evidence." (quotations and citations omitted).

In *Camillo*, the court vacated an award of punitive damages as a matter of law against a crane assembler despite the fact that defendant was aware of casting defects in the component aluminum sheaves five years prior to the accident and also had notice of three prior incidents involving broken sheaves. Similarly, in this case neither the documentary evidence which plaintiff offers to support its claim for punitive damages, nor

the proposed testimony of their expert witness, establish that Budd or Goodyear "was motivated by malice, vindictiveness, or criminal intent, or that its conduct was intentionally outrageous or undertaken with wanton disregard for the public safety." *Id.*

Plaintiffs rely on *Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277 (2d Cir.1990) and *Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir.1990) to support their argument that evidence of notice of the defect in the defendant's product and a failure to warn about that defect is sufficient to support punitive damages. That reliance is unavailing. Both of these cases involved the death of workers who were exposed to asbestos in situations where the manufacturer knew of the dangers of asbestos contamination but failed to warn its customers and users of the danger. In both *Simpson* and *Johnson*, it is a single product—asbestos—which poses the danger to those who breathe it and in both cases the manufacturer failed to warn the user of the connection between asbestos and lung cancer which had been established since the 1940's. Failure to warn the customer, where the manufacturer had notice of the effects of asbestos exposure, and where there was no obvious way for the workers who were exposed to know about the danger, clearly evidenced a "wanton disregard for the public safety."

Here, however, neither the tire nor the rim were dangerous separately; the 16″ tire only became dangerous if mounted on a 16.5″ rim. In contrast with *Johnson* and *Simpson*, the victim/user, West, had full access to all the information necessary to avoid a mismatch: the size was stamped by the manufacturers on both the tire and the rim and furthermore, the tire contained a warning to mount it only on a 16″ rim.

Finally, I address the issue of the severity of the mismatch problem. On oral argument, defendants asserted without dispute that the light truck pick-up has been the most popular vehicle in the United States for two decades and that approximately 13.5 million 16.5″ wheel rims were manufactured by Budd

alone between 1966 and 1983 and probably another 20 million by competitors. Approximately 75 million 16″ wheels were manufactured in the same time frame and about 20 million 16″ tires are manufactured annually. Defendants observed that there are perhaps two, three, or four mountings per wheel over each rim's lifetime. Therefore, the approximately 167 alleged incidents of tire explosion resulting from 16″/16.5″ mismatches over the more than twenty five years since the first defendant mismatch incident in 1971, must be placed in the context of millions and millions of uneventful tire mountings. I conclude that the relationship of the number of incidents of explosion to the number of tires mounted in any given year is so minor as to fail to justify punitive damages.

Plaintiffs' evidence as set forth in their motion papers, exhibits, and affidavits, even if credited as true, fails to establish an essential element of their claim for punitive damages which is that defendants' conduct was reckless, wanton, close to criminality, or intentional in the disregard of the safety of the public. Accordingly, defendants' motion is granted and plaintiffs' claim for punitive damages [8] is dismissed as a matter of law.

So ordered.

---

**8.** There are several other outstanding motions *in limine* which the court will address at a later     date.