**TIME WARNER CABLE OF NEW YORK CITY, A DIVISION OF TIME WARNER ENTERTAINMENT COMPANY, L.P., Plaintiff,**

v.

**Raymond BARNES, Lana Augustin, Janer Bigio, Tom Boyan, John Donohue, Edward Drusilovsky, Joseph Francois, Glenna Freeman, Harold Goldman, Milton Gonzalez, Nerida Gonzalez, Justin Iige, Hershel Katz, Mary Merlock, Ramon Pena, Raymon Rivera, Frank Rodriguez, Susan Streeter, Defendants.**

No. 96 Civ. 7023(CBM).

United States District Court, S.D. New York.

July 22, 1998.

Daniel John Lefkowitz, Offices of Daniel J. Lefkowitz, Jericho, NY, for Plaintiff.

Mary Merlock, New York, NY, pro se.

Jason L. Stern, Brooklyn, NY, for Defendant Frank Rodriguez.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

After an inquest hearing on July 17, 1997, this court makes the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. Plaintiff, Time Warner Cable of New York City ("TWCNYC"), is a division of Time Warner Entertainment Company, L.P., a limited partnership organized under the State of Delaware, with offices at 120 East 23rd Street, New York, New York. TWCNYC operates cable television systems in portions of New York City, including the entire boroughs of Manhattan and Queens and parts of Brooklyn, New York.

2. Defendant Lana Augustin ("Augustin") is an individual who, at all relevant times, resided at 325 West 93rd Street, Apartment 42, New York, New York, 10025.

3. Defendant Milton Gonzalez ("Gonzalez") is an individual who, at all relevant times, resided at 654 West 161st Street, Apartment 5H, New York, New York 10032.

4. Defendant Ramon Pena ("Pena") is an individual who, at all relevant times, resided at 444 East 118th Street, Apartment 1, New York, New York 10035.

## A. TWCNYC's Business

5. Pursuant to its franchise agreement with the City of New York, TWCNYC provides cable television programming and services to homes, businesses and other premises within its franchise areas which request and pay for the same. TWCNYC's cable television programming services are private communication signals, not intended for public use or enjoyment, and are only offered and made available to authorized, paying subscribers by agreement.

6. TWCNYC provides its cable television services to authorized subscribers via subscription agreements pursuant to which TWCNYC agrees to provide the programming services requested by a subscriber in

return for the subscriber's agreement to pay for the same on a monthly basis.

7. TWCNYC's subscribers pay a monthly fee for the specific level and amount of programming services which each subscriber has selected and purchased from TWCNYC. Each TWCNYC subscriber is entitled to receive the exact level and amount of cable programming and services which that subscriber has selected and for which that subscriber has paid.

8. TWCNYC offers its cable television programming services in various packages, which include broadcast television channels, individual "premium" programming channels, such as Home Box Office ("HBO"), Showtime, Cinemax or the Disney Channel, and pay per view channels. Each programming service package (other than pay per view programming) which a subscriber has selected and purchased carries a discrete fee which is billed collectively by TWCNYC on a monthly basis. A TWCNYC subscriber's purchase of all "premium programming" channels from TWCNYC (not including any pay per view events, which carry a per event fee) costs approximately $80.00 per month.

9. TWCNYC's pay per view programming is a service which allows an authorized subscriber to purchase individual special programming events, such as championship boxing matches and movies, for separate, additional fees over and above that subscriber's regular monthly bill for the package of programming services which he or she receives. TWCNYC's pay per view events range in costs from $3.95 (for first run movies) to $49.95 (for special events, such as the Tyson vs. Holyfield championship boxing match). All of the pay per view programs which a subscriber purchases during the monthly billing period are added to and included in the subscriber's monthly bill for cable service.

10. As part of its cable service, TWCNYC provides each of its subscribers with equipment, known as a converter-decoder, which is necessary to allow each individual subscriber to receive and view the specific level and amount of cable programming that a subscriber has selected, purchased and is thereby authorized to receive. The rental fee for

the converter-decoder provided by plaintiff to its subscribers is regulated by the Federal Communications Commission on an actual cost basis and is included on the subscriber's monthly bill.

11. TWCNYC receives the signals to its cable television programming services, including premium and pay per view programming, in over-the-air transmissions from orbiting satellites and local radio towers. In order to protect its cable programming from theft and unauthorized reception, TWCNYC encrypts or "scrambles" the signals to any programming which a subscriber has not purchased and is not authorized to receive. When TWCNYC's programming is in a scrambled mode, it is distorted and unviewable to the subscriber who has not paid for such programming.

12. TWCNYC separately authorizes, either by a technical modification or by a computer command, each of the converter-decoders provided to its subscribers so that a particular device will descramble only those scrambled programming channels which the respective subscriber has selected and purchased.

13. The converter-decoders which TWCNYC provides to its subscribers have the technology feature and function known as "addressability." Addressability is a communication link between a cable operator's central computer and the descrambling and computer circuitry in each converter-decoder provided to its subscribers.

14. Addressability, for example, enables cable operators to send a signal command to the converter-decoders assigned to those subscribers who have purchased a pay per view program. The signal command instructs the converter-decoder assigned to those subscribers to descramble the particular pay per view program which has been purchased. When the pay per view program is over, another command is sent for those converter-decoders to resume scrambling pay per view programming. This procedure limits a subscriber's authorized reception of pay per view programming to only those programs which have been purchased. Addressability also enables a cable television

operator to upgrade or downgrade a subscriber's authorized level of service without having to mechanically alter or physically replace a converter-decoder in a service call to a subscriber's residence.

15. Encoding ("scrambling") is the primary security method employed by TWCNYC and other cable television operators to prevent subscribers from receiving programming services for which they have not paid. Used in conjunction with TWCNYC's authorized converter-decoder device, scrambling ensures that each TWCNYC subscriber will only receive and be able to view cable television programming which that subscriber has purchased.

16. There is a "black market" industry of various manufacturers, vendors and distributors of "pirate" cable television converter-decoders. Pirate converter-decoders are sold to cable subscribers who use these devices to avoid paying a cable operator's subscription fee for authorized reception of premium and pay per view cable television programming. The manufacturers and sellers of "pirate" converter-decoders modify legitimate converter-decoders, which cable system operators use to restrict access to non-purchased programming, into devices which descramble all scrambled programming, including pay per view, without a cable operator's authorization. In a "pirate" converter-decoder, the built-in addressability technology is disabled so that a cable operator cannot communicate with the pirate device or recognize that it has been attached to its cable system. There is no legitimate function or purpose on a cable system for a converter-decoder which has been modified to descramble all scrambled cable programming, including constant reception to pay per view events. Such a device is only capable of enabling its user to receive unauthorized cable television programming without having to make payments to a cable operator.

**B. TWCNYC's Investigation of Freedom Electronics**

17. In February of 1995, TWCNYC initiated an investigation of a business known as Freedom Electronics, Inc. ("Freedom"), located in Fort Lauderdale, Florida, which TWCNYC suspected was engaged in the sale and distribution of "pirate" converter-decoder devices. TWCNYC's investigators made purchases of "pirate" converter-decoders from Freedom on February 17, 1995 and on February 23, 1995 and were advised by Freedom that these devices would enable them to receive all of TWCNYC's scrambled premium and pay per view programming services without TWCNYC's authorization. On the basis of its investigation, TWCNYC applied for and obtained an *ex parte* order from a United States District Court in the Southern District of Florida directing deputy United States Marshals to execute a civil seizure of Freedom. On July 21, 1995, the United States Marshal for the Southern District of Florida executed a seizure of Freedom's business premises in which hundreds of cable television descrambling devices and business records, including sales invoices and computer records, were seized. A complete recitation of the circumstances surrounding TWCNYC's investigation and civil prosecution against Freedom is reported in the decision, *Time Warner Cable of New York City v. Freedom Electronics, Inc.*, 897 F.Supp. 1454 (S.D.Fla.1995).

**C. Defendants' Misconduct**

18. TWCNYC recovered and copied Freedom's computer database containing information as to Freedom's sales and shipments of "pirate" converter-decoder devices to purchasers across the United States. TWCNYC then initiated computer commands to organize the database of Freedom's sales of "pirate" converter-decoders whereby every transaction involving a zip code wherein TWCNYC operates cable television systems was listed. By this process, TWCNYC obtained a list of every person or entity in TWCNYC's New York City franchise area who purchased "pirate" converter-decoders from Freedom.

19. The computer information obtained by TWCNYC from Freedom's records contains the relevant transactions which occurred between Freedom and defendants Augustin, Gonzalez and Pena. On January 14, 1994, defendant Augustin purchased a Starcom DPBB converter-decoder from Freedom for

$375.00, including shipping and handling charges. On October 26, 1993, defendant Gonzalez purchased a Base Band Epoxy Cube from Freedom for $285.00, including shipping and handling charges. On March 18, 1994, defendant Pena purchased a Base Band Epoxy Cube from Freedom for $285.00, including shipping and handling charges.

20. Defendants Augustin, Gonzalez and Pena were each, at all relevant times, subscribers to TWCNYC's cable television programming services and they each received an authorized converter-decoder from TWCNYC that was specifically programmed to descramble only the amount of cable television programming services for which these defendants had paid.

21. The specific type of "pirate" cable television converter-decoder device purchased by the defendants is compatible to defeat the encryption or "scrambling" technology employed by TWCNYC in Manhattan, where defendants each reside. As alleged in the Complaint, the purpose that defendants Augustin, Pena and Gonzalez had in purchasing "pirate" cable television descrambling devices from Freedom was to descramble, intercept and receive TWCNYC's unauthorized premium and pay per view programming services. Complaint at ¶¶ 18–19. Indeed, since the defendants were each provided with an authorized converter-decoder from TWCNYC, their only practical reason to spend hundreds of dollars for a descrambling device is to descramble TWCNYC's scrambled premium and pay per view programming services which carry additional fees to be received with TWCNYC's authorization.

**D. TWCNYC's Allegations**

22. TWCNYC alleges that each of the defendants, Augustin, Gonzalez and Pena, have intercepted TWCNYC's premium and pay per view cable television programming services without TWCNYC's authorization by use of the "pirate" converter-decoders which these defendants purchased and obtained from Freedom. Complaint at ¶¶ 18–22. TWCNYC seeks defendants' liability for violations of 47 U.S.C. sections 605(a) and 553(a)(1), as well as for violations of Section 225.6 of the New York State Public Service Law.

23. Defendants Augustin, Gonzalez and Pena were each served with a copy of the summons and complaint and failed to answer or move against the complaint. For such reason, a Clerk's Certificate of Default was entered against each of the defendants upon plaintiffs application. As defendants have failed to appear or defend in this action, they have been adjudged in default by the Orders of this court.

## II. CONCLUSIONS OF LAW

24. This action arises under 47 U.S.C. sections 553(a)(1) and 605(a). The court has original jurisdiction over TWCNYC's federal claims in this action under 28 U.S.C. section 1331. This court has supplemental jurisdiction over TWCNYC's New York State claims. Venue is properly established in the Southern District of New York pursuant to 28 U.S.C. section 1391(b).

25. It is well established that upon entry of a default judgment for "failure to plead or otherwise defend" against a Complaint, a defendant admits every "well-pleaded allegation" of the Complaint except those relating to damages. See Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 63 (2d Cir.1971), rev'd on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); Flaks v. Koegel, 504 F.2d 702, 704 (2d Cir.1974) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established unless the amount is liquidated or susceptible of mathematical computation"); Dow Chemical Pacific Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 336 (2d Cir.1986) ("In principle, [the defendant] had no standing to participate in the further adjudication of issues as to its liability to plaintiffs"). In addition to liability established by defendants' default, TWCNYC offered competent evidence in the testimony of witnesses and the devices and documents received into evidence to establish defendants' violations of 47 U.S.C. sections 605(e)(4) and 553(a)(1).

**A. TWCNYC's Claims under Title 47 of the United States Code**

26. The unauthorized interception of any cable television programming services

which originate and are delivered via satellite or by other means of over-the-air signal transmission is a violation of 47 U.S.C. sections 605(a) and 553(a)(1). *See International Cablevision, Inc. v. Sykes and Noel,* 75 F.3d 123, 133 (2d Cir.1996).

27. TWCNYC has alleged and established that its premium and pay per view cable television programming is transmitted from and received by TWCNYC via orbiting satellites. Accordingly, TWCNYC's cable programming services are protected from unauthorized reception under 47 U.S.C. section 605(a). *See International Cablevision, Inc. v. Sykes and Noel,* 75 F.3d at 133; *Time Warner Cable of New York City v. U.S. Cable T.V., Inc.,* 920 F.Supp. 321 (E.D.N.Y. 1996); *Cablevision Sys. Corp. v. Muneyyirci,* 876 F.Supp. 415 (E.D.N.Y.1994).

28. By viewing and receiving the signals and programming to TWCNYC's premium and pay per view channels without TWCNYC's authorization, each of the defendants committed violations of 47 U.S.C. section 605(a) and 553(a)(1). TWCNYC is a "person aggrieved" by defendants' conduct in violation of the Communications Act and is thereby authorized to institute this action against defendants under 47 U.S.C. sections 605(e)(3)(A) and 553(c)(1).

29. When a court concludes that a defendant's conduct violated both sections 605 and 553 of Title 47 of the United States Code, a plaintiff may recover damages under only one of those sections. *See American Cablevision of Queens v. McGinn,* 817 F.Supp. 317 (E.D.N.Y.1993). For violations of both sections 605 and 553, the Second Circuit has held an aggrieved cable operator is entitled to elect to recover damages under section 605 in consideration of section 605's higher damages awards than that provided for under section 553. *See International Cablevision, Inc. v. Sykes,* 997 F.2d 998, 1007 (2d Cir.1993); *International Cablevision v. Sykes and Noel,* 75 F.3d at 127.

30. TWCNYC has elected to recover statutory damages under 47 U.S.C. section 605(e)(3)(C) for the violations of sections 605(a) and 553(a)(1) committed by defendants Augustin, Gonzalez and Pena in this action.

For each violation of 47 U.S.C. section 605(a), a court may award the aggrieved party a statutory damage award of "not less than $1,000 or more than $10,000, as the court considers just." 47 U.S.C. 605(e)(C)(I)(II). Based on the circumstances of this case, this court awards a statutory damage award under section 605(e)(3)(C)(I)(II) in the amount of *$1,000.00* against defendant Augustin for her violation of 47 U.S.C. section 605(a). This court hereby awards a statutory damage award under section 605(e)(3)(C)(I)(II) in the amount of *$1,000.00* against defendant Gonzalez for his violation of 47 U.S.C. section 605(a). This court hereby awards a statutory damage award under section 605(e)(3)(C)(I)(II) in the amount of *$1,000.00* against defendant Pena for his violation of 47 U.S.C. section 605(a).

## B. TWCNYC's Claims for Violations of the New York State Public Service Law

31. TWCNYC's Complaint pleads a supplemental cause of action against defendants for violations of New York State Public Service Law, section 225.6. It is clear that the same facts which establish defendants' violations of 47 U.S.C. sections 605(a) and 553(a)(1) also establish defendants' violations of section 225.6 of the New York State Public Service Law.

32. New York State Public Service Law, section 225.6, provides, in pertinent part:

"Any cable television company may initiate a civil proceeding to ... enjoin the procurement or reception of cable television services without its consent.

. . . . .

Upon a showing by a cable television company in such a proceeding that such cable television service has been obtained without its consent ... and, upon a showing by such cable television company ... that such cable television service has been obtained under circumstances evincing a knowledge that such service would be obtained without payment of the proper charges therefor, ... such company may be awarded such monetary damages and such punitive award as the court in its discretion shall deem to be just and appro-

priate for the purposes of this subdivision ..."

33. From the defendants' default and the inquest testimony of Thomas Allen, it is established that the defendants intercepted TWCNYC's unauthorized programming by the use of "pirate" converter-decoders purchased from Freedom. Such conduct constitutes the procurement of TWCNYC's programming services without TWCNYC's consent or authorization; and, additionally, demonstrates that defendants' conduct in so doing was to knowingly and intentionally avoid payment of TWCNYC's fees for having to legitimately subscribe to TWCNYC's premium and pay per view programming services.

34. For violations of section 225.6 of the New York State Public Service Law, a court, in the exercise of its discretion, may assess monetary damages in a sum as the court considers just and appropriate. *Id.* The court may also assess punitive damages for a violation of section 225.6 of the New York State Public Service Law. *Id.* Based on the circumstances of this case, this court awards monetary damages in the amount of *$1,000.00* against defendant Augustin for her violation of section 225.6 of the New York State Public Service Law. This court hereby awards monetary damages in the amount of *$1,000.00* against defendant Gonzalez for his violation of section 225.6 of the New York State Public Service Law. This court hereby awards monetary damages in the amount of *$1,000.00* against defendant Pena for his violation of section 225.6 of the New York State Public Service Law.

35. The standard for an award of punitive damages in New York is a demanding one. In order to recover punitive damages, the plaintiff must show that the defendant's conduct is reckless or involves a "callous disregard" for plaintiff's rights.

*See Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). *See also Johnson v. Celotex Corp.,* 899 F.2d 1281 (2d Cir.1990); *Seguros Banvenez v. S/S Oliver Drescher,* 761 F.2d 855 (2d Cir.1985); *West v. Goodyear Tire and Rubber Co.,* 973 F.Supp. 385 (S.D.N.Y.1997). Since TWCNYC did not prove that defendants acted recklessly or in "callous disregard" for plaintiff's rights, the court declines to award plaintiff punitive damages under the New York State Public Service Law.

36. Where a court's finding of liability under two different laws is based on the same set of facts, the plaintiff is barred from recovering damages under both laws. Allowing recovery under both laws would be a double recovery, which is a mistake of law. *See Abou–Khadra v. Mahshie,* 4 F.3d 1071 (2d Cir.1993). Therefore, the court concludes that TWCNYC is entitled to a total of *$1,000.00* in monetary damages against defendant Augustin. The court concludes that TWCNYC is entitled to a total of *$1,000.00* in monetary damages against defendant Gonzalez. The court concludes that TWCNYC is entitled to a total of *$1,000.00* in monetary damages against defendant Pena.

## C. TWCNYC's Recovery of Costs and Attorney's Fees

37. Finally, 47 U.S.C. section 605(e)(3)(B)(iii) authorizes a court to award to a "prevailing aggrieved party" the costs and reasonable attorney's fees which it incurred in prosecuting its claims to judgment. Plaintiff submits an affidavit from its counsel, William B. Jung, Esq., of its contemporaneous time entries in support of an award of attorney's fees and costs associated with the inquest and default proceedings against defendants Augustin, Gonzalez and Pena. This court hereby awards the additional sum of *$2,651.25*[1] as plaintiff's recovery of reasonable attorney's fees. Therefore, the court

---

1. The court reached this figure as follows: Plaintiff submitted documentation supporting its request for a total of $3,435.00 in attorney's fees, plus an additional $75.00 for service of the complaint upon defendants. The court divided plaintiffs total request for attorney's fees by four, since some of the time entries by plaintiffs attorneys included work on plaintiff's case against another defendant, John Donohue. (Donohue's actions were not at issue at the inquest hearing on July 17, 1997 involving Augustin, Gonzalez and Pena). Thus, dividing the total attorney's fees by four results in a total of $858.75 in attorney's fees per defendant. The court then added $25.00 to cover the cost of serving the complaint upon each defendant, for a total of $883.75 per defendant in attorney's fees and costs.

concludes that defendant Augustin must pay Time Warner $883.75 in attorney's fees and costs. The court concludes that defendant Gonzalez must pay Time Warner $883.75 in attorney's fees and costs. The court concludes that defendant Pena must pay Time Warner $883.75 in attorney's fees and costs.

SO ORDERED.